UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY FABRIKANT,                    :
                                      :CIVIL ACTION NO. 3:11-CV-438
          Plaintiff,                  :
                                      :(JUDGE CONABOY)
          v.                          :
                                      :
STATE FARM FIRE AND CASUALTY          :
COMPANY,                              :
                                      :
          Defendant.                  :
                                      :

_____

### MEMORANDUM

Here we consider State Farm Fire and Casualty Company's Motion
for Summary Judgment (Doc. 19).  In the underlying action,
Plaintiff claims that Defendant is liable for breach of contract,
bad faith, and violations of the Unfair Trade Practices and
Consumer Protection Law ("UTPCPL") based on its handling of
Plaintiff's claim for insurance coverage following a fire which
destroyed his house on November 26, 2009.  (Doc. 1 at 11-20.)  With
its motion for summary judgment, Defendant seeks judgment in its
favor on all claims.  (Doc. 19.)

This matter is now fully briefed and ripe for disposition.
For the reasons discussed below, we conclude Defendant State Farm
Fire and Casualty Company's Motion for Summary Judgment (Doc. 19)
is properly granted.

### I. Background

**A.   *PROCEDURAL BACKGROUND***

Plaintiff filed his Complaint on February 7, 2011, in the

Court of Common Pleas of Lackawanna County (Doc. 1 at 11) and Defendant removed the Complaint to this Court on March 8, 2011 (Doc. 1 at 1).  The Complaint contains three counts: Count I for Breach of Contract (Doc. 1 at 13); Count II for Bad Faith (*id.* at 16); and Count III, a claim under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq. (*id.* at 18).

On March 15, 2011, Defendant filed a motion to dismiss the Complaint. (Doc. 3.)  The Court denied the motion with its April 27, 2011, Memorandum and Order.  (Doc. 11.)

Defendant State Farm Fire and Casualty Company's Motion for Summary Judgment (Doc. 19) was filed on February 29, 2012. Defendant State Farm Fire and Casualty Company's Statement of Material, Undisputed Facts in Support of Its Motion for Summary Judgment (Doc. 20) was filed on the same date, and Defendant filed its supporting brief (Doc. 22) on March 13, 2012.  Plaintiff filed Plaintiff's Answer to Defendant's Statement of Material Facts in Support of Its Motion for Summary Judgment and Counter-Statement of Facts (Doc. 24) on March 20, 2012, and Plaintiff's Brief in opposition to Defendant's Motion for Summary Judgment (Doc. 25) on March 23, 2012.  Defendant filed State Farm Fire and Casualty Company's Reply Brief in Support of Its Motion for Summary Judgment (Doc. 28) on April 4, 2012.  On April 5, 2012, Defendant filed Defendant State Farm Fire and Casualty Company's Response to

2

Plaintiff's Counter-Statement of Facts, in Support of State Farm's Motion for Summary Judgment.  (Doc. 29.)

**B.   *FACTUAL BACKGROUND***

The event giving rise to this action was a fire which essentially destroyed Plaintiff's house on November 26, 2009, Thanksgiving Day.  (Doc. 20 ¶ 2.)  Plaintiff was not at home at the time--after having dinner with his sons at the home of friends, he was en route to the movies when he got word of the fire.  (Doc. 24 at 10 ¶ 2.)  Plaintiff's residence was covered by a homeowners policy issued by Defendant State Farm Fire and Casualty Company. (Doc. 20 ¶ 1.)  Plaintiff made a claim under his policy for dwelling coverage, personal property coverage, and loss of use coverage.  (Doc. 20 ¶ 3.)  As of the filing of this summary judgment motion, Plaintiff's dwelling and personal property claims had been paid in full.  (Doc. 20 ¶¶ 6-7.)

Plaintiff reported the loss to Defendant shortly after the fire occurred on November 26, 2009.  (Doc. 20 ¶ 13.)  The State Police Fire Marshall, Trooper Mark Naylor, visited the scene on November 27, 2009.[1]  (Doc. 24 at 10 ¶ 3.)  Plaintiff reports that Trooper Naylor said he believed it was a space heater that was the origin of the fire.  (Doc. 24 at 10 ¶ 2; Doc. 29 at 2 ¶ 2.)

On November 27, 2009, Defendant hired Paul Savage, Senior Fire

---

[1]  Plaintiff cites Trooper Naylor's deposition testimony (Plaintiff's Exhibit # 3; Doc. 24-7).  Trooper Naylor's report is not in the record.  (Doc. 29 at 4 ¶ 10.)

& Explosion Consultant, of PT&C Forensic Consulting Services, P.A., ("PT&C") to conduct an origin and cause investigation on the fire. (Doc. 20 ¶ 15.)

On November 27, 2009, Defendant sent Plaintiff a letter outlining and explaining coverages, the claims process, and a summary of Plaintiff's responsibilities.  (Doc. 20 ¶ 16.)  Personal property inventory forms were enclosed with the letter.  (*Id.*)

On November 28, 2009, Defendant's Claim Team Manager Jeff McIntyre met with Plaintiff to inspect the loss site and discuss the claim, coverages, and policy forms.  (Doc. 20 ¶ 17.)  During the inspection, McIntyre learned that Plaintiff's wife recently filed for divorce.  (Doc. 20 ¶ 18.)  McIntyre reported that he learned from a neighbor that Plaintiff had financial problems, the first propane provider canceled and the second supplier would only deliver on a cash basis, and Plaintiff was heating with electric space heaters at the time of the fire.  (*Id.*)  McIntyre also reported that Plaintiff advised him he owed $37,000 on his mortgage and was up to date on his payments.[2]  (*Id.*)

Also on November 28, 2009, Defendant's Fire & Explosion Consultant Paul Savage met with Plaintiff and McIntyre at the

---

[2]  In response to this paragraph and many others, Plaintiff admits only that Defendant's employee or agent testified to or recorded the information set out in Defendant's statement of facts. *See*, *e.g.*, Doc. 24 ¶¶ 18, 19, 22-23. We will not note this type of response in each instance.  However, where appropriate, our recitation of facts will indicate the source of Defendant's averments, *i.e.*, log entries, reports, etc.

scene.  (Doc. 20 ¶ 19.)  McIntyre later reported that Savage had shared with him a sample that had a clear odor of flammables on the carpet pad.  (*Id.*)

Savage provided an oral report to McIntrye on November 28, 2009.  (Doc. 20 ¶ 20.)  In Savage's written Origin and Cause report issued on December 15, 2009, he concluded that the "'ignition source' of the fire was possibly a manually contacted open flame or human prepared source such as a pack of matches with cigarette fuse.  He opined the first material ignited was the heat source, then ordinary combustibles and ignitable/flammable liquid."  (Doc. 20 ¶ 22.)  Savage classified the "cause" of the fire as "incendiary" and attached to his report the findings of the Armstrong Forensic Laboratory, Inc., dated December 9, 2009, which concluded that the carpet and matting from Plaintiff's living room by the stairs tested positive for concentrated gasoline.  (Doc. 20 ¶¶ 19-20.)

At an unspecified time, Trooper Naylor, the State Police Fire Marshall who had investigated the scene, finished his investigation and concluded that the fire was caused by an electric space heater and was accidental.  (Doc. 24 ¶ 3.)  He does not recall being contacted by any representative of Defendant.[3]  (Doc. 24-7 at 16-

---

[3]  Plaintiff states that SIU claim investigator Ted Marzani testified that he used a private investigator in this case and was not sure if the investigator contacted the State Police Fire Marshall.  (Doc. 24 ¶ 8.)  Marzani testified that his understanding was that the State Police listed the fire as undetermined.  (*Id.*)

17.)  Trooper Naylor testified at his deposition that two
individuals who investigate a fire could come to different
conclusions.  (*Id.* at 17; Doc. 29 at 2 ¶ 3.)

On November 29, 2009, McIntyre referred the claim to
Defendant's Special Investigative Unit ("SIU").  (Doc. 20 ¶ 24.)
He reported the following reasons for doing so: 1) origin and cause
found evidence of incendiary/flammables in carpet padding; 2)
Plaintiff's finances were in question and a neighbor indicated
Plaintiff had employment and worker's compensation issues; 3)
Plaintiff was not at home at the time of the loss; 4) Plaintiff was
heating his house with electric space heaters and the neighbor
advised the propane service was disconnected due to financial
issues; and 5) the claim was originally reported as a space heater
fire and the Origin and Cause findings were under review.  (Doc. 20
¶ 24.)

On December 3, 2009, McIntyre again met with Plaintiff, gave
him PPI forms, explained how to complete them, and discussed other
aspects of the claim.  (Doc. 20 ¶ 25.)

On December 10, 2009, Defendant took Plaintiff's recorded
statement in which Plaintiff stated he did not know how much income
he made as a self-employed photographer, he may have been thirty to
sixty days behind on his mortgage of approximately $30,000, and he
had not paid his 2008 property taxes.  (Doc. 20 ¶ 26.)  At that
time, Defendant requested that Plaintiff sign a records

6

authorization form and that he provide his cell phone records, 2007 and 2008 tax returns, and mortgage history. (*Id.*) By letter dated December 18, 2009, Defendant asked Plaintiff for documentation including the 2007 and 2008 federal tax returns, mortgage statements, cellular phone records, checking and savings account statements, and a signed authorization so Defendant could request a copy of Plaintiff's credit report and review his financial status prior to the loss, and to secure current mortgage information. (Doc. 20 ¶ 27.)

By letter dated December 23, 2009, Defendant sent Plaintiff a reservation of rights letter informing him there was a question if there had been an accidental direct physical loss to the property. (Doc. 20 ¶ 29.) Although Plaintiff agrees that Defendant sent the letter, he specifically denies that the fire was not accidental. (Doc. 24 ¶ 29.) Plaintiff adds that Defendant "was aware at all times that the Pennsylvania State Police Fire Marshall concluded that the fire was accidental."[4] (*Id.*) Plaintiff points to an invoice from the Brunozzi Investigative Agency, Inc., dated February 19, 2010, in which "[t]he following notation was made, "01/07/10 contacted and interviewed PSP Fire Marshall.  01/08/10

---

[4] Plaintiff does not provide citation in support of this averment nor, as noted previously, does he provide the State Police Fire Marshall's report as part of the record.

contacted and brief Mr. Marzani.'"[5]  (Doc. 24 at 14 ¶ 9.)

By letter dated January 27, 2009, Defendant again asked that Plaintiff provide the information requested in the December 18, 2009, letter and quoted policy requirements regarding Plaintiff's duties after the loss.  (Doc. 20 ¶ 31.)

In a preliminary report dated January 31, 2010, Defendant's SIU investigator summarized the investigation to date, noting the following: 1) it was a set fire with a positive sample analysis of gasoline; 2) Plaintiff appears to have financial difficulties, mortgage payments in excess of 60 days, and propane heat service turned off because of nonpayment; 3) Plaintiff has a pending worker's compensation claim that had not been resolved since 2002; and 4) Plaintiff does not want to disclose his income.  (Doc. 20 ¶ 32.)

By letter dated February 4, 2010, Defendant advised Plaintiff that the investigation was continuing, the claim was being referred to Attorney Scott Grenoble to conduct Plaintiff's Examination Under Oath ("EUO"), and reminded Plaintiff of his post-loss obligations. (Doc. 20 ¶ 34.)  By letter dated February 17, 2010, Attorney Grenoble requested the EUO of Plaintiff and asked for production of a number of documents.  (Doc. 20 ¶ 35.)  The EUO was scheduled for

---

[5]  As noted previously, Ted Marzani is a claim investigator for Defendant's SIU who was assigned to this case.  He testified he used a private investigator in this case and was not sure if the investigator contacted the State Police Fire Marshall.  (Doc. 24 ¶ 8; *see* Doc. 24-10 at 23-25.)

March 1, 2010, but Plaintiff did not appear.  (Doc. 20 ¶¶ 37-38.)
Plaintiff acknowledges that he did not appear, explaining that he
"was experiencing severe emotional difficulties due to his loss,
which lead to the hiring of a public adjuster to assist him."
(Doc. 24 ¶ 38.)  By letter to Plaintiff dated March 3, 2010,
Attorney Grenoble confirmed that Plaintiff did not appear for the
EUO or advise Attorney Grenoble that he would not be appearing.
(Doc. 20 ¶ 39.)  Attorney Grenoble explained Plaintiff's duty to
cooperate with Defendant's investigation and appear for the EUO
which was rescheduled for March 23, 2010.  (*Id*.)  Attorney Grenoble
again asked for the signed authorization and previously requested
documents.  (*Id.*)

By letter to Plaintiff dated March 15, 2010, Defendant
confirmed that it was continuing its investigation of the claim
pursuant to its reservation of rights because it was questionable
whether there had been compliance with the provisions of the policy
requiring the assistance and cooperation of Plaintiff.  (Doc. 20 ¶
40.)  The letter referenced pertinent policy language and the one-
year suit limitation clause.  (*Id.*)

At the EUO Plaintiff testified that his wife had moved out
approximately two months before the fire and served him with
divorce papers, he was not current on most of his bills at the time
of the loss, he could not estimate how far behind he was on his
mortgage or any other payments, and that his photography business

9

operated at a loss over the last several years.  (Doc. 20 ¶¶ 42-
43.)  Plaintiff also testified that he had over $6,000 in cash
either under the carpet or in the closet of the master bedroom, he
did not have substantive savings, did not know the balances of his
personal or business bank accounts, and had outstanding college
loans but was not making any payments.  (Doc. 20 ¶ 44.)

     As of the date of the EUO, Plaintiff had not provided
requested information, but Plaintiff agreed to do so then.  (Doc.
20 ¶ 45.)  Plaintiff adds that he did not have the information as
it had been lost in the fire but he did agree at the EUO to provide
it within two to three weeks.  (Doc. 24 ¶¶ 45-46.)  Defendant
followed up this request with correspondence dated March 25, 2010,
April 12, 2010, April 22, 2010, May 20, 2010, and June 15, 2010,
again requesting the information.  (Doc. 20 ¶¶ 47, 50, 51, 53, 55.)
In the May 20th correspondence, Defendant informed Plaintiff that
failure to cooperate could jeopardize coverage for the claim and
requested that Plaintiff provide the information requested within
twenty days.  (Doc. 20 ¶ 55.)  By letter dated June 28, 2010,
Defendant advised Plaintiff that the claim was not finalized due to
the continuation of the coverage investigation, including all
requested documentation.  (Doc. 20 ¶ 57.)

     On July 8, 2010, Plaintiff hired a public adjuster, Scott
Seeherman.  (Doc. 20 ¶ 58.)  In correspondence dated July 9, 2010,
Defendant (through Attorney Grenoble) advised Seeherman of

Defendant's attempts to get Plaintiff to cooperate and provide the requested documentation.  (Doc. 20 ¶ 61.)

On July 19, 2010, Defendant's Special Investigation Unit completed an internal progress report in which the EUO of Mrs. Fabrikant was summarized and it was noted the Origin and Cause expert advised that the solvent used in the space heater did not show up in the lab samples and is unlikely to have been the ignition source of the fire since it is manufactured to be heated at very high temperatures.[6]  (Doc. 20 ¶ 66.)

By letter dated August 18, 2010, Plaintiff (through PA Seeherman) sent Defendant some requested records and sent others on August 23, 2010.  (Doc. 20 ¶¶ 70, 71.)  Those sent on August 18th were the first documents Plaintiff provided to Defendant.  (Doc. 20 ¶ 70.)  The August 23rd documents showed that Plaintiff's business checking account had a balance of $301.32 on October 31, 2009, and $154.45 on November 30, 2009, and his personal checking account had a balance of $978 on October 12, 2009, and $50.42 on November 12, 2009.  (Doc. 20 ¶ 71.)

In letters dated August 31, 2010, and September 4, 2010, Attorney Grenoble again requested outstanding information and itemized the remaining outstanding documents in the September 4th

---

[6]  This information from Paul Savage was in response to a request from the SIU investigator--Savage was asked to determine if the sample that was positive for flammable liquids had oil from a space heater.  (Doc. 20 ¶ 54.)

correspondence.   (Doc. 20 ¶¶ 72-73.)

Documents forwarded to Defendant on September 13, 2010, showed a past due cell phone balance.  (Doc. 20 ¶ 74.)  The amount due as of November 28, 2009, was $801.10.  (*Id.*)

In his September 14, 2010, correspondence, Attorney Grenoble acknowledged receipt of 2007 and 2008 tax returns, bank statements, and cell phone records beginning on November 29, 2009, and requested production of outstanding documents within twenty days including a signed records authorization, mortgage account statements for the six months preceding the loss, cell phone records for October and November 2009, 2009 tax information and the PPI forms.  (Doc. 20 ¶ 76.)

Correspondence continued between Attorney Grenoble and PA Seeherman regarding outstanding documents and PA Seeherman requested that Defendant extend the policy condition requiring suit to be filed within one year of the date of loss in his October 22, 2010, letter.  (Doc. 20 ¶¶ 77-80.)  By letter dated November 5, 2010, Grenoble asked Seeherman for an explanation of some credit report information Grenoble had received, noted he had not received the requested mortgage information and informed Seeherman that Defendant was not willing to extend the one-year suit limitation provision "in view of the significant delays in cooperation from Mr. Fabrikant."  (Doc. 20 ¶ 82.)  Plaintiff points to evidence that Defendant extended the suit limitation provision on a case by case

12

basis.  (Doc. 28 at 13 ¶ 8.)

The parties differ regarding the reasons for Defendant's failure to complete its investigation by the November 26, 2010, suit expiration period: Defendant states it was because of Plaintiff's delay in providing requested information (it "only began receiving the information in late August, September, November and December of 2010") (Doc. 20 ¶ 86); Plaintiff discounts this reason, averring that Defendant could have completed its investigation, as the investigation was unreasonable and Defendant knew the State Police Fire Marshall concluded the loss was accidental within days of the fire (Doc. 24 ¶ 86).  Plaintiff also asserts that Defendant's SIU Claim Investigator Ted Marzani stated at his deposition that he did not need more time to investigate or conclude the claim as of November 26, 2010.  (Doc. 24 at 13 ¶ 8.) Defendant points to further testimony by Marzani where he states that he was still waiting for information as of October 26, 2010, and an opinion letter from Attorney Grenoble.  (Doc. 29 at 5 ¶ 8.)

The parties also differ as to the effect of the expiration of the one-year suit limitation period: Defendant asserting that it would continue its investigation and pay the claim if it determined that coverage was warranted (Doc. 20 ¶ 83); Plaintiff asserting that Defendant would not have paid the claim if Plaintiff had not commenced litigation evidenced by Defendant forcing Plaintiff to file a writ of summons and, thereafter, ruling Plaintiff to file a

complaint (Doc. 24 ¶ 83).

Plaintiff filed a Praecipe for Writ of Summons in the Court of Common Pleas of Lackawanna County on November 9, 2010, after learning Defendant would not waive the one-year suit provision. (Doc. 24 at 15 ¶ 11; Doc. 24-11 at 68.)  The Writ of Summons was received by Defendant on November 16, 2010.  (Doc. 24 at 15 ¶ 11.)

Attorney Gary Drakas Filed a Praecipe for Entry of Appearance on December 21, 2010, in the Court of Common Pleas of Lackawanna County entering his appearance on behalf of Defendant.  (Doc. 24 at 15 ¶ 11; Doc. 24-11 at 72.)  Drakas filed a Praecipe for Rule to File Complaint, dated December 21, 2010, which stated the following: "Kindly enter a Rule on Plaintiff to file a Complaint within twenty (20) days from service of said Rule or suffer a judgment on non pros."  (Doc. 24-11 at 75.)  The Rule was entered by the Prothonotary of Lackawanna County on December 28, 2010. (Doc. 24-11 at 75.)  The Certificate of Service on the Rule is dated January 3, 2011.[7]  (Doc. 24-11 at 76.)

By letter dated December 30, 2010, Attorney Grenoble advised Seeherman that Defendant would attempt to complete its investigation within 30 to 45 days.  (Doc. 20 ¶ 85.)

---

[7] In his Counter-Statement of Facts, Plaintiff states the following: "On December 28, 2010, State Farm, through Attorney Drakas, served a Rule to File Complaint upon the Plaintiff's counsel."  (Doc. 24 at 15 ¶ 11 (citing Exhibit G#4 attached to Attorney Grenoble's deposition).)  In the cited Exhibit, the Certificate of Service is dated January 3, 2011.  (Doc. 24-11 at 76.)

In correspondence dated February 7, 2011, Defendant (through Attorney Grenoble) informed Plaintiff that it was extending coverage of Plaintiff's dwelling claim.  (Doc. 20 ¶ 89; Doc. 24 at 15-16 ¶ 12.)  Plaintiff's Complaint was filed on the same day at 3:05 p.m.  (*Id.*)  Plaintiff received Defendant's letter on February 8, 2011.  (*Id.*)  In the correspondence extending dwelling coverage, Defendant continued to reserve its rights on Plaintiff's personal property claim pending receipt of the PPI forms.  (Doc. 20 ¶ 88.) Defendant requested the information within thirty days.  (*Id.*)

Defendant paid Plaintiff $154,422.75 later in February and paid the balance available on the dwelling claim, $4,077.25, in April 2011.  (Doc. 20 ¶¶ 90-94.)

Between March and July of 2011, the parties exchanged correspondence regarding the PPI forms and other matters.  (Doc. 20 ¶¶ 92, 95-97.)  On October 3, Defendant paid Plaintiff $109,975.00 for Plaintiff's personal property claim.  (Doc. 20 ¶ 98.)  On November 22, 2011, Defendant paid Plaintiff an additional $2,500 representing the jewelry/fur policy limit.  (Doc. 20 ¶ 102.)

## II. Discussion

### A. *Summary Judgment Standard*

Summary judgment is appropriate when the movant demonstrates there is no "genuine issue as to any material fact."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

15

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted).

The initial burden is on the moving party to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id.* at 325. The non-moving party may not rest on the bare allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give

16

rise to a genuine issue.  *Id.* at 324.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence."  *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

**1.   *Breach of Contract***

Defendant first argues it did not breach its contract with Plaintiff: it has paid dwelling limits of $158,500, full personal property limits of $118,875, and additional living expenses up to the twenty-four month policy limit.  (Doc. 22 at 3.)  Defendant concludes payment of these policy limits since the filing of the Complaint renders Plaintiff's contract count moot.  For the reasons discussed below, we conclude Defendant is entitled to summary judgment on this count.

Under Pennsylvania law, a plaintiff has the burden of showing the following: 1) the existence of a contract including its essential terms; 2) a breach of a duty imposed by the contract; and 3) damages to the plaintiff as a result of the breach.  *See*, *e.g.*, *Core-States Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999) (citation omitted).  "[T]he measure of damages applicable in a case of breach of contract is that the aggrieved party should be placed as nearly as possible in the same position he would have occupied

had there been no breach." *Harman v. Chambers*, 57 A.2d 842, 521 (Pa. 1948).

Defendant argues Plaintiff cannot satisfy the second and third elements of his contract claim. The argument is based on Defendants' assertions that it has tendered the full policy limits purchased by Plaintiff so there has not been a breach of contract and Plaintiff is not entitled to recover any additional monies or damages pursuant to the insurance policy. (Doc. 22 at 4.)

Plaintiff responds that Defendant's argument ignores Defendant's "duty to adjust the claim in a timely manner [and] also ignores the fact that it unreasonably forced the Plaintiff to file an action in court to preserve its rights under the policy, and then once done, forced the Plaintiff to litigate the claim by issuing a Rule to File Complaint." (Doc. 25 at 7.)

Based on the circumstances of this case and the evidence of record, we find Plaintiff has not shown Defendant did not adjust the claim in a timely manner. Defendant hired a cause and origin investigator, Paul Savage, the day after the fire. (Doc. 20 ¶ 15.) Savage conducted a site investigation and met with Plaintiff the next day, November 28, 2009. (Doc. 20 ¶ 19.) Defendant's Claim Team Manager Jeff McIntyre was at the scene at the same time and later reported that during Savage's site investigation he found a carpet pad sample containing an odor of flammables and shared this information with McIntyre. (*Id.*) McIntyre also learned, either

18

through Plaintiff or a neighbor, that Plaintiff's wife had recently left him and filed for divorce and that Plaintiff was experiencing financial difficulties.  (Doc. 20 ¶ 18.)

Given this information, no reasonable factfinder could conclude it was unreasonable for McIntyre to refer the claim to Defendant's Special Investigation Unit ("SIU") on November 29, 2009.  (Doc. 20 ¶ 24.)  As noted in the Background section of this Memorandum, in support of his improper handling claim Plaintiff continually points to State Police Fire Marshall Mark Naylor's conclusion that the fire was caused by a malfunctioning space heater and thus accidental in nature (claiming Defendant ignored this information).  We find this reliance insufficient as contrary findings were suggested from the outset of Defendant's timely initiated investigation--within two days of the fire Defendant had information that the fire did not appear to be accidental and Plaintiff had personal and financial difficulties.  Although we do not know when Trooper Naylor issued his report and conclusion, we know he testified that two individuals who investigate a fire could come to different conclusions.  (Doc. 29 at 2 ¶ 3.)  Thus, even if Defendant were aware of Trooper Naylor's conclusion, Trooper Naylor's observation regarding the validity of differing conclusions supports the reasonableness of Defendant's further investigation of the cause and origin of the fire based on the information known to Defendant within two days of the event.

19

Continuing the investigation was also warranted when Defendant received Savage's written report after the claim was referred to the SIU.  In his report, Savage determined the cause of the fire to be "incendiary" and attached laboratory findings which concluded that the carpet and matting samples from the living room by the stairs tested positive for concentrated gasoline.  (Doc. 20 ¶¶ 19-22.)  No evidence suggests that this conclusion was undermined during the course of the investigation.  Rather, as reflected in a July 2010 SIU internal progress report, Savage later clarified (opon request from the SIU) that the space heater solvent was not the likely source of the fire because, among other things, the sample that was positive for flammable liquids did not have oil from a space heater.  (Doc. 20 ¶¶ 54, 66.)

In addition to their expert's findings, other aspects of the investigation also supported the propriety of Defendant's claims handling practices regarding Plaintiff's loss.  Defendant learned through taking a recorded statement from Plaintiff that he was behind on his mortgage, had not paid his 2008 property taxes, and he did not know how much he made as a self-employed photographer.[8] (Doc. 20 ¶ 26.)  Defendant's attempts to gather information regarding Plaintiff's financial condition and other aspects of his

---

[8]  Attorney Grenoble pointed out in his deposition that the investigation of a potential arson claim requires a detailed investigation, including financial background information which potentially could go to the motive element of arson.  (Doc. 24-11 at 11-12.)

claim were unsuccessful in that Plaintiff did not provide the information repeatedly requested.  (*See* Doc. 20 ¶¶ 26-57.)  Even after Plaintiff hired a public adjuster, Scott Seeherman, at the beginning of July 2010 (Doc. 20 ¶ 58) and Seeherman told Plaintiff he had a responsibility to comply with Defendant's requests (*id.* ¶ 62), Defendant reports that it still had not received all requested information as of November 5, 2010 (*id.* ¶ 82).[9]  Seeherman never told Defendant it was not entitled to the requested information. (Doc. 20 ¶ 62.)  Information received relating to Plaintiff's financial status showed limited funds and past due bills.  (*See*, *e.g.*, Doc. 20 ¶¶ 26, 71, 74.)

Even assuming *arguendo* that Defendant received all requested information required to make a determination on dwelling coverage by the one-year anniversary date of the fire, evidence shows that Defendant was still repeating requests for documents in the thirty-day period preceding the date of loss (*see* Doc. 20 ¶¶ 81, 82), and Defendant's assimilation and assessment of that information could not be expected to occur overnight (*see*, *e.g.*, Doc. 28 at 2 & nn.2 & 3).  In that Defendant made a dwelling coverage determination within approximately two months of receiving the information, the

---

[9]  Defendant asserts it advised Plaintiff in correspondence of November 5, 2010, that it still had not received the requested mortgage statements.  (Doc. 20 ¶ 82.)  Plaintiff does not specifically dispute that he had provided same as of that date though he states that he denies the allegations in the letter. (Doc. 24 ¶ 82.)

above summary of the investigative period of the dwelling claim shows that no reasonable factfinder could conclude that Defendant unreasonably pursued its investigation.  Regarding Defendant's investigation of Plaintiff's personal property claim, Plaintiff admits requested information was still being sent to Defendant in July and August of 2011.  (Doc. 20 ¶¶ 97-98; Doc. 24 ¶¶ 97-98.)

Looking at both the dwelling and personal property aspects of Plaintiff's loss claim, no reasonable factfinder could conclude that Defendant is liable for breach of contract on the basis that it did not adjust the claim in a timely manner.  We now turn to a review of the other bases Plaintiff proffers in support of its breach of contract claim.

Plaintiff's assertion that Defendant breached its contract by forcing Plaintiff to file a writ of summons is also unavailing. Defendant does not deny that it could have waived the provision but states it did not so here "in view of significant delays in cooperation from Mr. Fabrikant."  (Doc. 20 ¶ 82.)  Plaintiff does not dispute that the one-year suit limitation period was an express provision of the policy which Defendant had the legal right to enforce.  Thus, Plaintiff essentially argues that Defendant breached the contract by failing to waive one of its provisions. Although Defendant *could have* waived the one-year period, and from some perspectives a decision to do so may have been preferable, alternate possibilities and preferences do not give rise to a

22

breach of contract claim, particularly where the reason relied upon to deny the request cannot be classified as disingenuous.

Plaintiff's claim that Defendant breached its contract by requiring him to file a complaint after he filed the writ of summons is also unavailing.  Plaintiff states that Defendant "actually forced the Plaintiff to litigate the claim by serving a Rule to File Complaint upon Plaintiff's counsel."  (Doc. 25 at 9.) Defendant responds that it had a procedural right pursuant to Pennsylvania Rule of Civil Procedure 1037 to rule Plaintiff to file a complaint after Plaintiff sued Defendant via a Writ of Summons. (Doc. 28 at 8.)

The one-year limitation provision in the insurance contract at issue states the following: "Suit Against Us.  No action shall be brought unless there has been compliance with the policy provisions.  The action must be started within one year after the date of loss or damage."  (*See* Doc. 28 n.4.)  This provision does not require a plaintiff to file a complaint nor does it address the propriety of a defendant ruling him to do so.  However, when suit is filed by a writ of summons, Pennsylvania law provides that "the prothonotary, upon praecipe of the defendant, shall enter a rule upon the plaintiff to file a complaint."  *See* Pa. R. Civ. P. 1037. Thus, Defendant acted in accordance with Pennsylvania law and nothing in the contract's suit provision prohibited Defendant from exercising its right to file a rule to file a complaint.  Without

more, no reasonable juror could find that Defendant breached its contract with Plaintiff by serving a Rule to File Complaint.[10]

### 2.   *Bad Faith*

Defendant argues that the undisputed facts show it did not act in a bad faith manner in handling Plaintiff's claim.  (Doc. 22 at 4.)  For the reasons discussed below, we agree there is no basis upon which a jury could conclude Defendant acted in bad faith.

An action for bad faith in Pennsylvania is governed by 42 Pa. C.S. § 8371 which provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S. § 8371.

---

[10]   This aspect of Plaintiff's claim will be discussed further in the context of Plaintiff's bad faith allegations, and we add the "without more" caveat because, for example, if Plaintiff were to make a sufficient showing that Defendant may be liable for bad faith because it served the Rule to File Complaint, a correspondent finding could be made that it violated its contractual duty of good faith and fair dealing in serving the Rule.  *See*, *e.g.*, *Berg v. Nationwide Mut. Ins. Co., Inc.*, No. 12 MDA 2008, ---A.3d---, 2012 WL 1313055, at *9 (Pa. Super. April 17, 2012).

The statute does not define what constitutes bad faith but Pennsylvania courts, the Third Circuit Court of Appeals, and decisions from district courts within the Third Circuit provide ample guidance.  "The term 'bad faith' under section 8371 concerns 'the duty of good faith and fair dealing in the parties' contract and the manner in which an insurer discharged . . . its obligation to pay of a loss in the first party claim context.'"  *Berg v. Nationwide Mut. Ins. Co., Inc.*, No. 12 MDA 2008, ---A.3d---, 2012 WL 1313055, at *9 (Pa. Super. April 17, 2012) (quoting *Toy v. Metrolpolitan Life Ins. Co.*, 928 A.2d 186, 199 (Pa. 2007)) (alteration in original).  A recent opinion from the Court of Appeals for the Third Circuit set out the relevant legal framework:

> "Bad faith" under Pennsylvania's bad faith statute--42 Pa. Const. Stat. § 8371, which provides a remedy in an action under an insurance policy--is defined as "any frivolous or unfounded refusal to pay proceeds of a policy." *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).  A valid cause of action for bad faith requires "clear and convincing evidence . . . that the insurer: (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Id.* Under the "clear and convincing" standard, "the plaintiff [must] show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or nor the defendants acted in bad faith.'" *Id.* (quoting *Bostick v. ITT Hartford Grp., Inc.*, 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999)).  Though we have found that bad faith may be found in circumstances other than an insurer's refusal to pay, "[a] reasonable basis is all that

25

is required to defeat a claim of bad faith." *Id.*
*See also Frog, Switch & Mfg. Co. V. Travelers Ins.*
*Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999).

*Treadways LLC v. Travelers Indem. Co.*, No. 11-2596, 2012 WL 764917, at *2 (3d Cir. Mar. 12, 2012) (not precedential) (alteration in original).

The Pennsylvania Superior Court has observed that "[b]ad faith claims are fact specific and depend on the conduct of the insurer *vis a` vis* the insured." *Condio v. Erie Ins. Exchange*, 899 A.2d 1136, 1143 (Pa. Super. 2006) (citing *Williams v. Nationwide Ins. Co.*, 750 A.2d 881, 887 (Pa. Super. 2000)). *In O'Donnell ex. rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901 (Pa. Super. 1999), the Pennsylvania Superior Court discussed the expanding nature of the applicability of the bad faith statute and held that the conduct of an insurer during the pendency of litigation may be considered as evidence of bad faith. *O'Donnell*, 734 A.2d at 906-08. Bad faith is not restricted to an insurer's denial of benefits and includes a wide variety of objectionable conduct including lack of good faith investigation and failure to communicate with a client. *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 500-01 (Pa. Super. 2004) (listing cases). A claim for bad faith may be based on an alleged violation of the Unfair Insurance Practices Act ("UIPA"), 40 P.S. § 1171.1 *et seq. Romano v. Nationwide*, 646 A.2d 1228, 1230 (Pa. Super. 1994). Negligence or bad judgment do not constitute bad faith. *Brown*, 860 A.2d at 501 (citing *Adamski v. Allstate Ins.*

*Co.*, 738 A.2d 1033, 1036 (Pa. Super. 1999)).  "To support a finding
of bad faith, the insurer's conduct must be such as to 'import a
dishonest purpose.'  In other words, the plaintiff must show that
the insurer breached its duty of good faith through some motive of
self-interest or ill will."  *Id.* (quoting *Adamski*, 738 A.2d at
1036).

The Third Circuit Court of Appeals addressed the situation
where a claim was eventually paid in *3039 B Street Associates, Inc.
V. Lexington Ins. Co.*, 444 F. App'x 610 (3d Cir. 2011) (not
precedential):

> Even where a claim is eventually paid, "[d]elay is
> a relevant fact in determining whether bad faith
> has occurred," *Kosierowski v. Allstate Ins. Co.*,
> 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999) (citing
> *Klinger v. State Farm Mut. Auto Ins. Co.*, 115 F.3d
> 230, 234 (3d Cir. 1997)).  Nevertheless,
> "Pennsylvania law provides that it is not bad
> faith to conduct a thorough investigation into a
> questionable claim." [*Northwestern Mut. Life Ins.
> Co. v.*] *Babayan*, 430 F.3d [121,] 138 [(3d Cir.
> 2005)].

444 F. App'x at 612 (first alteration in original); *see also*
*O'Donnell*, 734 A.2d at 907-08 (noting the existence of "red flags"
that prompted the investigation).  *Berg* makes very clear that
focusing on an insurer's alleged lack of denial of benefits to
defeat a bad faith claim is misplaced.  2012 WL 1313055, at *11.

> [T]he trial court's focus on the alleged lack of
> denial of benefits [is] confusing in light of the
> test of section 8371, which sets forth no such
> requirement to be entitled to damages for the
> insurer's bad faith.  To the contrary, the focus
> in section 8371 claims cannot be on whether the

27

> insurer *ultimately* fulfilled its policy
> obligations, since if that were the case then
> insurers could act in bad faith throughout the
> entire pendency of the claim process, but avoid
> any liability under section 8371 by paying the
> claim at the end.  As our Supreme Court in *Toy*
> explained, the issue in connection with section
> 8371 claims is the *manner* in which insurers
> discharge their duties of good faith and fair
> dealing during the pendency of the insurance
> claim, not whether the claim is eventually paid.
> *Toy*, 593 Pa. at 41, 928 A.2d at 199.  For purposes
> of [the insureds'] section 8371 claim, whether
> [the insurer] ultimately paid the benefits due
> under the policy is not the relevant inquiry;
> instead the dispute is whether [the insurer] acted
> in bad faith in its dealings with the [insureds].

2012 WL 1313055, at *11.  *Berg* also observed that the Pennsylvania

Superior Court "has made clear that in bad faith insurance

litigation, the fact finder needs to consider 'all the evidence

available' to determine whether an insurer's conduct was 'objective

and intelligent under the circumstances.'" *Id.* at *13 (quoting *The

Birth Center v. The St. Paul Companies, Inc.*, 727 A.2d 1144, 1166

(Pa. Super. 1999), aff'd, 787 A.2d 376 (2001)).

    Plaintiff bases his bad faith claim on Defendant's

"unreasonable handling" of his claim.  (Doc. 25 at 10.)  He cites

the length of the investigation, the denial of an extension of time

for Plaintiff to file a writ of summons, serving a Rule to File

Complaint, Defendant's reference to a conversation that did not

occur, and Defendant's ultimate decision to pay the claim.  (Doc.

25 at 10-11, 13.)

    First, we conclude the length of the investigation does not

28

give rise to a bad faith claim in the circumstances of this case. The factual recitation set out above and discussed in the previous section of this Memorandum shows that within two days of the fire Defendant was aware of a cause and origin investigator's suspicion that the fire was not accidental and knew of financial difficulties in Plaintiff's life.  These are ample "red flags" to warrant the subsequent detailed investigation conducted by Defendant.  *See* *O'Donnell*, 734 A.2d at 907-08.  From this starting point, there is no dispute that Plaintiff did not provide documentation requested until many months after requests were repeatedly made and neither Plaintiff nor a representative objected to the propriety of Defendant's requests for information on any basis.  Therefore, no reasonable factfinder could conclude Defendant is liable for bad faith in awaiting responses to its requests before making a coverage decision.

We find no indication of bad faith in Defendant's adherence to the contractual provision of a one-year suit limitation.  As discussed above, Defendant does not deny that it could have waived the provision but did not so here "in view of significant delays in cooperation from Mr. Fabrikant."  (Doc. 20 ¶ 82.)  Because there is no doubt that Plaintiff caused the delays and because Defendant was authorized by the insurance contract to act as it did, we find no basis for finding bad faith in its actions.

We turn now to Plaintiff's contention that Defendant's serving

29

the Rule to File Complaint provides evidence of bad faith.  While this could be seen as a closer question than the investigation and writ of summons bases asserted, upon careful review of the record we conclude no reasonable factfinder could find Defendant's serving of the Rule presents clear and convincing evidence of bad faith.

Plaintiff's averments in support of his contention that issuing the Rule shows bad faith are vague and blend with his assertions regarding the one-year suit provision and writ of summons.  (*See* Doc. 25 at 12-13.)  Most specifically, Plaintiff asks, why, after he had filed the Writ, did Defendant "force the Plaintiff to litigate by issuing a Rule to Show Cause?" (Doc. 25 at 12).  Defendant argues serving the Rule is not evidence of bad faith because it had a procedural right to do so under Pennsylvania Rule of Civil Procedure 1037 and it was entitled to know the allegations and claims being made against it.  (Doc. 28 at 8.)

First, we note that exercising a procedural right would not necessarily insulate a defendant from bad faith liability if the plaintiff could show by clear and convincing evidence that the insurer's conduct "import[ed] a dishonest purpose" or exhibited a breach of its duty of good faith "through some motive of self-interest or ill will."  *Brown*, 860 A.2d at 501 (citation omitted).  Here Plaintiff has not made such a showing through his vague references to the log notes and various depositions.  (*See* Doc. 25 at 12-13.)

30

Although forcing a Plaintiff to litigate could, in some circumstances, give rise to a bad faith claim, those circumstances are not present here.  As set out above, a UIPA violation may be evidence of bad faith.  *Romano*, 646 A.2d at 1230.  In relevant part, the UIPA identifies a list of acts on the part of insurers, that, "if committed or performed with such frequency as to indicate a business practice shall constitute unfair claim settlement or compromise practices."  40 P.S. § 1171.5(a)(10).  One practice identified is "[c]ompelling persons to institute litigation to recover amounts due under the policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons."  40 P.S. § 1171.5(a)(10)(vii).  Here Defendant had not made any offer and eventually paid policy limits.  Therefore, by its explicit terms § 1171.5(a)(10)(vii) does not apply.

Further, we conclude that Defendant's exercise of its procedural right to serve a Rule to File Complaint does not evidence bad faith for several reasons.  Defendant's claim that it was entitled to know the allegations and claims being made against it (Doc. 28 at 8) is not without merit in that, although evidence suggests that no determination on coverage had been made at the time and such determination could moot some claims, other potential claims could be independent of the ultimate coverage decision.  In fact, that is the case with Plaintiff's Complaint in that he asserts breach of contract, bad faith, and UTPCPL claims based upon

Defendant's investigation of the claim which predated its filing of the Rule. (*See* Doc. 1 at 11-20; Doc. 25.)

Other evidence undermining Plaintiff's bad faith claim based on service of the Rule to File Complaint includes the following: 1) Attorney Grenoble, who had been handling the case for Defendant during the investigation stage and informed Plaintiff about when a decision would likely be made (Doc. 20 ¶ 85) was not the attorney who took over the litigation aspect of the case after the writ had been filed (Doc. 24-11 at 55); 2) no evidence suggests that Attorney Drakas, the litigation attorney who served the Rule to File Complaint, consulted with Attorney Grenoble about the status of the case, filing the Rule, or in any other way undertook the filing for an improper purpose (*see*, *e.g.*, Doc. 24-11 at 55); 3) the record contains no indication of inordinate delay between receipt of requested information and a final coverage determination--in fact, that determination was made within the thirty to forty-five day time period suggested by Attorney Grenoble in his December 30, 2010, correspondence (Doc. 20 ¶ 85); and 4) Defendant's decision to extend coverage preceded the filing of Plaintiff's Complaint[11] (Doc. 24 at 15 ¶¶ 11-12; Doc. 24-11 at 50-

---

[11] We find Defendant's assertions that the decision was made on or before February 4, 2011, to be supported by the following: Defendant sent Plaintiff a letter dated Monday, February 7, 2011, stating that it was extending coverage on Plaintiff's dwelling claim-the next business day after February 4th; Plaintiff's counsel filed the Complaint on February 7, 2011, at 3:05 p.m.(Doc. 24 at 15 ¶ 12); and, though Defendant's communication of its decision was

51).

It could be argued that, because the investigation and coverage decision was in its final stages, it would have been preferable to delay requiring Plaintiff to file the complaint.  In this context, Defendant's decision could at most be characterized as bad judgment, but bad judgment does not constitute bad faith. *Brown*, 860 A.2d at 501.  In summary, we find nothing in the record which indicates that Defendant's serving the Rule to File Complaint shows clear and convincing evidence of bad faith.[12]

Plaintiff's reliance on a letter from Plaintiff's counsel "confirming a conversation regarding a decision to extend coverage . . . that never occurred" (Doc. 25 at 11) does not evidence bad faith.  Even if we disregard Defendant's explanation of the complained of conduct (*see* Doc. 29 at 8-9; Doc. 24-11 at 50), Plaintiff does not argue that Defendant's coverage decision was made after Plaintiff filed his Complaint.  Assuming *arguendo* that

---

not ideal, Plaintiff has presented no evidence to suggest that Defendant's decision to extend coverage was in reaction to the filing of his Complaint.

[12]  Even if Defendant's decision to serve a rule to file a complaint when it was within thirty to forty-five days of making a coverage decision were of questionable motivation (an assumption we do not find supported by the record), such a conclusion would not support bad faith liability.  In the context of the entire claim-handling process and Plaintiff's consistently dilatory conduct, no reasonable factfinder could conclude that the singular action of serving a rule to file complaint is evidence that is "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, [that] the defendants acted in bad faith.'" *Treadways*, 2012 WL 764917, at *2

Attorney Grenoble (who wrote the letter informing Plaintiff that coverage was extended (Doc. 24-4 at 16)) knew that Plaintiff was under time constraints to file a complaint (something he denies (Doc. 24-11 at 55)), without evidence that a coverage decision post-dated the filing of the Complaint, his letter of February 7, 2011, may exhibit a poor business practice or bad judgment, but it does not serve as clear and convincing evidence of bad faith.

Plaintiff's averment that Defendant's ultimate decision to pay the claim evidences bad faith is also unavailing.  (Doc. 25 13.) We have previously concluded that Defendant had ample justification to pursue its investigation of the cause and origin of the fire. As Attorney Grenoble pointed out in his deposition, in the investigation of a potential arson claim, a detailed investigation is necessary and this includes financial background information. (Doc. 24-11 at 11-12.)  Given the propriety of Defendant's conduct in the investigative stage, its ultimate decision to pay the claim is not clear and convincing evidence of bad faith.

Finally, taking all of Plaintiff's proffered reasons in combination--the length of the investigation, the denial of an extension of time to for Plaintiff to file a writ of summons, serving a Rule to File Complaint, Defendant's reference to a conversation that did not occur, and Defendant's ultimate decision to pay the claim (Doc. 25 at 10-11, 13)--Plaintiff has not pointed to clear and convincing evidence of bad faith.  Perhaps less strict

34

enforcement of contract provisions, more limited availment of procedural possibilities, and better communication among those acting on Defendant's behalf could have avoided litigation. However, absent Plaintiff showing by clear and convincing that Defendant acted with "a dishonest purpose" or exhibited a breach of its duty of good faith "through some motive of self-interest or ill will," *Brown*, 860 A.2d at 501, his bad faith claim cannot succeed. No reasonable factfinder could conclude that Plaintiff has made such a showing.  Therefore, Defendant is entitled to summary judgment on Plaintiff's bad faith claim.

### 3.   *UTPCPL*

Defendant argues that Plaintiff's UTPCPL claim fails as a matter of law.  (Doc. 22 at 13.)  For the reasons discussed below, we agree.

The parties do not disagree on the relevant legal framework. (Doc. 22 at 13-14; Doc. 25 at 13-14.)  "In Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*, and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable." *Horowitz v. Federal Kemper Life Assur. Co.*, 57 F.3d 300, 307 (3d Cir. 1995) (citations omitted).  "To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably

relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

Defendant argues that "Plaintiff has failed to provide any evidence of any deceptive acts by State Farm, let alone justifiable reliance and resultant harm." (Doc. 22 at 14.)  In support of its treatment of Plaintiff's claim, Defendant points to its December 23, 2009, reservation of rights letter stating that it was investigating the claim because there was a question whether "there had been an accidental direct physical loss to the property," the fact that Defendant paid Plaintiff's alternate living expenses throughout the investigation, and that Defendant "had to beg Plaintiff to provide information necessary to complete its coverage investigation." (Doc. 22 at 14.)

Plaintiff, asserting that an insured's claim that the insurer conducted an unfair and unreasonable investigation established a viable UTPCPL claim (Doc. 25 at 14 (citing *Hardinger v. Motorists Mutual Ins. Co.*, 2003 U.S. Dist. LEXIS 3199 (E.D. Pa. Feb. 27, 2003), points to the Pennsylvania State Police Fire Marshall's determination that the fire was accidental as evidence that Defendant conducted an unfair and unreasonable investigation (*id.*). Plaintiff also relies upon this Court's assessment of the UTPCPL claim in our Memorandum addressing Defendant's Motion to Dismiss (Doc. 3) where we stated that Plaintiff's claim should not be

dismissed at that stage of the proceedings because his allegations could possibly "point to an unfair or unreasonable investigation which would support a UTPCPL claim." (Doc. 11 at 8.)  The language upon which Plaintiff relies is our statement that, by example, "if Plaintiff's assertion that Defendant accused and/or inferred that the fire was incendiary is supported by an expanded record, and if that accusation and/or inference is not shown to be fair and reasonable, then Defendant may be liable under a UTPCPL theory of recovery, *i.e.*, that the insurer conducted an unfair and unreasonable investigation." (Doc. 11 at 8 (citing *Shorb v. State Farm Mut. Auto. Ins. Co.*, 2005 U.S. Dist LEXIS 35648, 2005 WL 1137881, at *5 (M.D. Pa. April 25, 2005)).)

Plaintiff avers that

> [t]he expanded record now reveals that State Farm knew that the Pennsylvania State Police Fire Marshall concluded that the loss was accidental within days.  However, State Farm completely disregarded the same and embarked upon a mission to acquire every piece of information possible on every aspect of Plaintiff's life for well over a year.  After 14 months, State Farm disregarded its own expert on the fire loss and paid the claim.  A jury may easily conclude that State Farm's inference that the Plaintiff caused the fire was not fair and reasonable.

(Doc. 25 at 14.)

We disagree with Plaintiff's assessment of the inferences which may be derived from the record evidence.  As discussed at length in the previous sections of this Memorandum, given the

37

circumstances of this case, particularly the early evidence of at least questionable cause and origin of the fire, no reasonable factfinder could find a UTPCPL violation based on Defendant's investigation of the claim.   Therefore, Defendant is entitled to summary judgment on this claim.

### III. Conclusion

For the reasons discussed above, Defendant State Farm Fire and Casualty Company's Motion for Summary Judgment (Doc. 19) is granted and judgment on all claims are decided in Defendant's favor.   An appropriate Order accompanies this Memorandum.

<u>S/Richard P. Conaboy</u>
RICHARD P. CONABOY
United States District Judge

DATED: May 14, 2012

38